MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2023 ME 35
Docket:      Han-22-209
Argued:      April 6, 2023
Decided:     June 13, 2023

Panel:       STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

## STATE OF MAINE

v.

## RONALD T. CUMMINGS

MEAD, J.

[¶1] Ronald T. Cummings appeals from a judgment of conviction of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(A) (2013),[1] entered by the trial court (Hancock County, *Mallonee, J.*) following a jury trial, and from the sentence the court imposed. Cummings contends that the judgment must be vacated because the court committed obvious error in its response to a note from the jury during its deliberations, and because of prosecutorial error

---

[1] The indictment charged Cummings with sexually assaulting the victim in 2014. The evidence admitted at trial suggested that the crime might have occurred in 2013. Because Cummings "must be punished pursuant to the law in effect at the time of the offense," *State v. Parsons*, 626 A.2d 348, 351 (Me. 1993) (quotation marks omitted), and the statutes cited in this opinion are the same for 2013 and 2014, we apply the earliest applicable (2013) version.

Statutes formerly located in Title 17-A M.R.S., part 3, which included sections 1151 through 1349-F, were repealed and replaced by P.L. 2019, ch. 113, §§ A-1, A-2 (effective May 16, 2019) (now codified at 17-A M.R.S. §§ 1501-2314 (2023)).

2

occurring during the State's closing argument. We disagree and affirm the judgment of conviction.

[¶2] Cummings also contends that his sentence must be vacated because (1) the court lacked the authority to amend the sentence four days after it was originally imposed; (2) the amended sentence illegally increased his punishment; and (3) the amended sentence illegally imposed a requirement that he submit to polygraph testing as a condition of supervised release. We conclude that the court was authorized to amend Cummings's sentence and that the amendment was lawful. However, because the court did not conduct a new sentencing analysis when it significantly reduced the maximum sentence that it determined was appropriate for Cummings's crime, and because it is unclear whether the court required polygraph testing as a condition of supervised release, we vacate the sentence and remand for a new sentencing hearing.

## I. BACKGROUND

**A. Facts**

[¶3] Viewing the evidence admitted at trial in the light most favorable to the State, the jury rationally could have found the following facts. *State v. Beeler*, 2022 ME 47, ¶ 2, 281 A.3d 637.

[¶4] Beginning when the victim was age eleven and ending when she was fourteen, Cummings lived with the victim and her mother, who was in a relationship with Cummings. One day when the victim was in eighth grade and living in Bucksport, she was sick and stayed home from school with Cummings while her mother worked. Cummings took her for a ride to his friend's house in Orrington, where he picked up what she eventually learned were "pot brownies." He later gave her one of the brownies in the living room of her home, which made her feel lightheaded.

[¶5] Eventually the victim went to her bedroom; Cummings came in and led her to his bedroom. He put her on the bed where he "kept telling [her] to trust him," that "something similar like this had happened in his life," and that "every young person needs . . . somebody . . . [to] show[] them how to do sexual things in the bedroom." Cummings asked the victim to take her pants off and asked if he could show her how to receive oral sex. The victim started crying and sat up. Cummings then started touching her, pulled her to the edge of the bed, made her get on her hands and knees, and sexually assaulted her. In doing so, Cummings held her in place by putting his hands on her hips and holding her down on the bed; she could not get away from him. He stopped the assault when the victim was "crying really hard" and "freaking out" trying to get up;

4

Cummings "put [her] on his knees . . . sitting on the edge of the bed [saying] you did nothing wrong, this is normal, you can't tell anybody." When the victim said she was going to tell her mother, Cummings begged her not to tell and said he would hurt her brother and her mother and they would have no place to live.

[¶6] When the victim later wrote in her journal about what had happened, Cummings told her she could not ever talk about it or write it down, and that it "needed to be kept private." The journal disappeared. Cummings gave the victim $200 so she "wouldn't tell anybody." Sometime after she was assaulted, the victim discovered nude pictures of herself on Cummings's phone that had been taken without her knowledge when she was in her bedroom, as well as pictures of her in a bathing suit.

[¶7] In May 2015, the victim and her mother went to the Bucksport Police Department and met with an officer; the victim told the officer that "[her] mother's boyfriend had sex with [her]." Another officer, who was assigned as the primary investigator, talked to Cummings; he acknowledged having "pot cookies" in the house but did not say that he had given any to the victim. The victim told the investigator that just before Cummings sexually assaulted her, she was screaming "because she knew something bad was going to happen."

## B.     Procedure

[¶8]  In April 2019, Cummings was indicted on one count of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(A), and one count of possession of sexually explicit material (Class C), 17-A M.R.S. § 284(1)(C) (2013).  The court granted Cummings's motion to sever the counts for trial and only the conviction for gross sexual assault is at issue in this appeal.

[¶9]  The court held a jury trial on April 19, 2022.  After the State rested its case-in-chief, Cummings moved for a judgment of acquittal on the ground that there was insufficient evidence for the jury to find the required element of compulsion beyond a reasonable doubt.  *See* 17-A M.R.S. § 253(1)(A).[2]  The court denied the motion, and the jury returned a verdict of guilty.

[¶10]   At a hearing on May 3, 2022, the court denied Cummings's post-trial motion for a judgment of acquittal, which was again based on his

---

[2]  Title 17-A § 253(1)(A) (2013) provided, in part: "A person is guilty of gross sexual assault if that person engages in a sexual act with another person and . . . [t]he other person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E."

Title 17-A M.R.S. § 251(1)(E) (2013) provided:

> "Compulsion" means the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being.

> "Compulsion" as defined in this paragraph places no duty upon the victim to resist the actor.

6

assertion that there was insufficient evidence that the victim submitted to the sexual act as a result of compulsion. M.R.U. Crim. P. 29(b).

[¶11] The court held a sentencing hearing on June 24, 2022. In conducting the analysis required by 17-A M.R.S. § 1252-C (2013),[3] the court set the basic sentence at twelve years; the maximum sentence at fifteen years; and the final sentence at fifteen years, with all but eight years suspended, and eight years of supervised release. The court entered judgment accordingly.

[¶12] Three days later, the court held a conference with counsel to discuss "an anomaly of the sentence that was pronounced" and "how to remedy

---

[3] The statute provided:

> In imposing a sentencing alternative pursuant to section 1152 that includes a term of imprisonment relative to murder, a Class A, Class B or Class C crime, in setting the appropriate length of that term as well as any unsuspended portion of that term accompanied by a period of probation, the court shall employ the following 3-step process:
>
> **1.** The court shall first determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender.
>
> **2.** The court shall next determine the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case. These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest.
>
> **3.** The court shall finally determine what portion, if any, of the maximum period of imprisonment should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation to accompany that suspension.

17-A M.R.S. § 1252-C (2013). Section 1252-C was later repealed and replaced. P.L. 2019, ch. 113, §§ A-1, A-2 (effective May 16, 2019) (codified at 17-A M.R.S. § 1602 (2023)).

that."  The problem arose because the sentence imposed on Cummings conflicted with the applicable statutes, which authorized the court to suspend part of the maximum sentence if it was followed by probation, but not if it was followed by supervised release.[4]  *See* 17-A M.R.S. §§ 1203(1-A), 1231(1), 1252-C(3) (2013).  Furthermore, the maximum authorized term of probation available to the court was six years, not the eight years of supervision it imposed.  17-A M.R.S. § 1202(1-A)(A-1)(1) (2013).

[¶13]  The court noted that accomplishing what it had intended would require a sentence of eight years to serve, followed by eight years of supervised release—"functionally a more severe sentence than the one that was imposed" because a violation of supervised release would subject Cummings to up to eight years of additional confinement, rather than the additional seven years of potential imprisonment under the original split sentence.  *See* 17-A M.R.S. § 1231(6) (2013).  The court set the matter for further hearing the following day.

[¶14]  At that hearing, held four days after the initial sentencing, Cummings appeared with counsel.  The court began by acknowledging that it

---

[4] Supervised release was an authorized option for the court, but not as part of a split sentence.  By statute, a period of supervised release could begin only after a defendant had served his full term of imprisonment.  *See* 17-A M.R.S. §§ 1203(1-A), 1231(1), 1254 (2013).

8

had "mixed up the properties of probation and supervised release in formulating the final sentence that was pronounced." After the prosecutor noted that Cummings's potential imprisonment would increase from fifteen years to sixteen years if the court did what it said it had originally intended, the court stated that at the original sentencing hearing, "[m]y analysis of all of the competing factors of the *Hewey*[5] analysis persuaded me that the proportional and proper sentence for Mr. Cummings was to serve eight years, and then to add eight years of supervision." Accordingly, the court entered an amended judgment imposing a sentence of eight years' imprisonment to be followed by eight years of supervised release, with attached specific conditions.

[¶15] Cummings timely appealed and applied to allow an appeal of his sentence.[6] M.R. App. P. 2B(b)(1), 20. The Sentence Review Panel granted leave to appeal from the sentence and ordered that the sentence appeal be considered as part of the appeal from the judgment of conviction.

---

5 *State v. Hewey*, 622 A.2d 1151 (Me. 1993); *see* 17-A M.R.S. § 1252-C.

6 The State suggests, without elaboration or developed argument, that because Count 2 of the indictment was severed and remains pending, "one could argue that the appeal was premature." We deem that bare argument waived. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11 & n.6, 905 A.2d 290.

## II. DISCUSSION

### A. Jury Note

[¶16] Consistent with the applicable statutes, the court instructed the jury that "[t]o find defendant guilty you must find that he engaged in a sexual act with another person and[] the other person submitted as a result of compulsion. . . . Compulsion means the use of physical force, a threat to use physical force, or a combination thereof that makes a person unable to physically repel the actor." *See* 17-A M.R.S. §§ 251(1)(E), 253(1)(A) (2013).

[¶17] During its deliberations, the jury sent out a note asking two questions: "(1) Could we please have the definition of compulsion?" and "(2) Legal definition for altering 'state of mind' with pot cookies and alcohol— would that be a form of force?" In conferring with counsel, the court said: "I believe the only available response is to bring them back in, tell them again the definition of compulsion, and not respond to their second inquiry, which would constitute commenting on the evidence." That is what the court ultimately did, although it sent the jury in writing the instruction it had previously given on the definition of "compulsion" rather than reinstructing orally.

10

[¶18] Although defense counsel remarked that "the thing that bothers me is are they going to consider a mind-altering state of mind as a form of force," he told the court that "at this point in time I would say yes, we just give them that abbreviated definition [of 'compulsion']. And it says physical force in there so let them hash it out." When asked by the court if Cummings objected to its approach, defense counsel said he did not.

[¶19] Cummings now contends that the court erred in declining to answer the note's second question because the jury "did not comprehend" its instruction on compulsion, and so it may have convicted on an improper basis—namely, through proof of impairment of the victim's power to resist and not through proof of compulsion. *Compare* 17-A M.R.S. § 253(1)(A) *with* 17-A M.R.S. § 253(2)(A) (2013). Cummings was not charged with the section 253(2)(A) impairment by furnishing drugs or intoxicants alternative, and the jury was not tasked with considering the elements of that crime.[7]

[¶20] "We review jury instructions in their entirety to determine whether they presented the relevant issues to the jury fairly, accurately, and adequately, and we will vacate the court's judgment only if the erroneous

---

[7] Title 17-A M.R.S. § 253(2)(A) (2013) provided: "A person is guilty of gross sexual assault if that person engages in a sexual act with another person and . . . [t]he actor has substantially impaired the other person's power to appraise or control the other person's sexual acts by furnishing, . . . administering or employing drugs, intoxicants or other similar means."

instruction resulted in prejudice." *State v. Gaston*, 2021 ME 25, ¶ 24, 250 A.3d 137 (alteration and quotation marks omitted); *see State v. Rosario*, 2022 ME 46, ¶ 29, 280 A.3d 199 (stating that when the defendant fails to object to jury instructions, review is for obvious error). Cummings does not challenge the substance of the court's original instruction or its reinstruction in response to the note. Rather, he contends that the court's response to the note was incomplete because the court was required to give a separate answer to the jury's second question. His contention fails for two reasons.

[¶21] First, by agreeing to the court's response to the note, Cummings waived any objection to it now. *See State v. McLaughlin*, 2020 ME 82, ¶ 25, 235 A.3d 854; *State v. Wilson*, 409 A.2d 226, 229 (Me. 1979).

[¶22] Second, even if Cummings's objection were not waived, the court's response to the note answered both of the jury's questions. The first question asked for the definition of "compulsion" and the second—apparently an offshoot of the first—asked if the use of "pot cookies and alcohol" would qualify as "force" sufficient to satisfy that definition. The court's answer informed the jury for a second time that the force required to find Cummings guilty was "physical force." That answer was neither incomplete nor incorrect. We have said that

> [n]ot every statutory phrase requires explanation . . . . The focus is on whether the jury would have reasonably understood the common sense meaning of the term. The jury is ordinarily entrusted to determine the common meaning of words; when a term is not defined in a statute, a jury can generally determine the meaning of the term by common sense.

*State v. Hall*, 2019 ME 126, ¶ 28, 214 A.3d 19 (citations and quotation marks omitted).

## B. Prosecutorial Error

[¶23] In presenting the State's closing argument, the prosecutor asked the jury, when considering

> whether [the victim] was fabricating a story, what motive would she have for telling you that she was assaulted by Mr. Cummings? Has the jury heard one word about some reason . . . you see a movie, the child wants the natural parents to get back together and resents the stepparent or whatever. That's just one example. But did you hear anything about that? No. What motive would there possibly be for [the victim] to recite to you anything other than what actually happened to her?

[¶24] Cummings asserts that the judgment must be vacated on the ground of prosecutorial error because "the obvious implication was[] whether [the jury] heard any evidence *from the defense*," and so the State's argument "shifted onto the defendant a burden that he did not have." He acknowledges that he did not object to the State's argument at trial,[8] and so our review is for

---

[8] To the contrary, Cummings strategically responded in his own closing argument: "[The prosecutor] asked about a motive. We don't have to prove there was a motive, but I would submit

"obvious error affecting substantial rights." *In re Weapons Restriction of J.*, 2022 ME 34, ¶ 35, 276 A.3d 510 (quotation marks omitted); *see State v. Robbins*, 2019 ME 138, ¶ 11, 215 A.3d 788 ("An error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding. . . . When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." (alteration, citations, and quotation marks omitted)).

[¶25] It is well established that "prosecutors must limit their arguments to the facts in evidence. . . . Shifting the burden of proof to the defendant or suggesting that the defendant must present evidence in a criminal trial is improper closing argument." *In re Weapons Restriction of J.*, 2022 ME 34, ¶ 36, 276 A.3d 510 (alterations, citation, and quotation marks omitted); *see State v. White*, 2022 ME 54, ¶ 27, 285 A.3d 262. We discern no improper shifting of the burden here, and thus no error, much less obvious error. Although Cummings asserts that the challenged portion of the State's argument must refer to his failure to supply a motive, *but see supra* n.8, it could easily be understood to

this to you. You saw her testimony. She is an angry child." He went on to explain why the victim's testimony should lead the jury to reach that conclusion.

14

refer to a credible victim who did not testify to anything that suggested a motive for her to lie.

## C.    Sentencing

[¶26]   Concerning his appeal from the sentence imposed by the court, Cummings contends that (1) the court lacked the authority to issue an amended sentence; (2) the amended sentence was illegal because it was more severe than the original; and (3) he is, or may be, subject to an unlawful requirement to submit to polygraph examinations as a condition of his supervised release. We conclude that the court was authorized to amend the sentence it originally imposed and that the amended sentence was not illegal. However, because the court reduced Cummings's maximum sentence to eight years using the same sentencing analysis that originally resulted in a fifteen-year maximum sentence, and because it is unclear whether submission to polygraph testing is a condition of Cummings's supervised release, we vacate the sentence and remand for the court to conduct a de novo sentencing hearing.

### 1.    Authority to Amend the Sentence

[¶27]  Cummings's argument that the trial court lacked the authority to amend his sentence rests on his construction of M.R. App. P. 3(b), which limits the actions a trial court may take once an appeal is docketed pursuant to

Rule 3(a).[9]  Here, Cummings filed his notice of appeal on June 24, 2022, but it was not entered on the trial court's docket until June 30, two days after the court amended Cummings's sentence.  Until docketing occurred, Rule 3(b) was not invoked and the trial court retained full authority over the case.  *See* Alexander, *Maine Appellate Practice* § 3.1(b) at 67-68 (6th ed. 2022) ("*Once an appeal is docketed in the trial court and 'Law' is marked on the docket*, the trial court's authority to . . . take further action in the matter is limited, pending disposition of the appeal by the Law Court.  *After docketing*, primary authority over the matter shifts to the Law Court." (emphasis added)); *State v. Curtis*, 1998 ME 254, ¶ 4, 721 A.2d 175 ("Judgment is considered to occur when a sentence imposed is entered on the criminal docket.").

[¶28]  Furthermore, even if Rule 3(b) controlled, the trial court "is permitted . . . to conduct proceedings . . . for the correction . . . of a sentence pursuant to M.R.U. Crim. P. 35(a)."  M.R. App. P. 3(c)(1).  Maine Rule of Uniform Criminal Procedure 35(a), in turn, allows a court "on [its] own motion . . . [to] correct an illegal sentence or a sentence imposed in an illegal manner."  The original sentence imposed on Cummings was, contrary to his contention, illegal.

---

[9]  Maine Rule of Appellate Procedure 3(b) provides that after an appeal is docketed in the trial court, "The trial court shall take no further action pending disposition of the appeal by the Law Court except as provided in Rules 3(c) and (d) of these Rules."

[¶29]  Although Cummings, in arguing that his original sentence was not illegal, is correct in asserting that it would have been "perfectly legal [for the court] to impose a split sentence and probation rather than supervised release," *see* 17-A M.R.S. §§ 1152(2)(B), 1201, 1231(1) (2013), the court could not have imposed a split sentence with eight years of probation because the statutory maximum was six years, 17-A M.R.S. § 1202(1-A)(A-1)(1).  Accordingly, even if the court had originally imposed probation instead of supervised release, Cummings's sentence would have required correction, and M.R. App. P. 3(b) allowed the trial court to take that action.

## 2. Legality of the Amended Sentence

[¶30]  We review the legality of a sentence de novo.  *State v. Murray-Burns*, 2023 ME 21, ¶ 18, 290 A.3d 542.  As the trial court recognized, the amended sentence increased Cummings's potential incarceration from fifteen years to sixteen years.[10]  It is nonetheless the operative sentence because it was imposed as part of a single, unitary sentencing proceeding.  The amended judgment was entered and docketed on June 28, 2022, the same day on which the original judgment was docketed.  "Judgment is considered to occur when a

---

[10]  The court originally imposed a maximum sentence of fifteen years.  Under the amended sentence, Cummings is required to serve eight years and is then exposed to an additional eight years of incarceration if his supervised release is fully revoked.  17-A M.R.S. § 1231(6) (2013).

sentence imposed is entered on the criminal docket." *Curtis*, 1998 ME 254, ¶ 4, 721 A.2d 175. The court's original judgment entered four days earlier had not become final before it was amended, and so it is the amended judgment from which Cummings appeals.

### 3. Sentencing Analysis

[¶31] Because Cummings was convicted of gross sexual assault in violation of 17-A M.R.S. § 253(1)(A), the court was permitted, but was not required, to impose a period of supervised release as part of the sentence. 17-A M.R.S. § 1231(1). Although we conclude that the court had the authority to impose what was a lawful amended sentence, the sentencing analysis the court employed requires that we vacate the sentence and remand for a de novo sentencing hearing.

[¶32] Ordinarily, the statutory three-step sentencing procedure required the court to first determine a basic sentence "considering the particular nature and seriousness of the offense"; then determine the maximum sentence after considering aggravating and mitigating factors appropriate to the case; and finally decide what portion, if any, of the maximum sentence to suspend and the length of a term of probation to accompany the suspended portion. 17-A M.R.S. § 1252-C. If the court chose to impose a period of

18

supervised release after imprisonment, however, the court would not proceed to the third step because no part of a sentence followed by supervised release is suspended.[11]  *See supra* n.4.

[¶33]  At the first sentencing hearing, the court conducted a sentencing analysis following the statutory procedure and determined that an appropriate maximum sentence was fifteen years given the nature of the crime Cummings committed, aggravated by the exploitation of his relationship with the victim and the effect of his actions on her.  Four days later, at the hearing held to correct the original sentence, the court did not undertake a new sentencing analysis but rather stated:

> My analysis of all of the competing factors of the *Hewey* analysis[12] persuaded me that the proportional and proper sentence for Mr. Cummings was to serve eight years, and then to add eight years of supervision. . . . To the extent that there's a necessity for modifying the *Hewey* analysis, I will simply say that the aggregate of all of those factors persuaded me that that is . . . the correct outcome . . . .

---

[11]  What was implicit in 2013 is now explicit in the current version of the statute, which makes clear that supervised release follows the maximum period of imprisonment determined at step two. 17-A M.R.S. § 1602(3) (2023) ("When the court . . . chooses to impose a period of supervised release after imprisonment for any other violation of section 253, . . . the court, after employing the first 2 steps of the sentencing process as specified in subsection 1, paragraphs A and B, shall determine the appropriate period of supervised release to follow the maximum term of imprisonment.").

[12]  *See supra* n.5.

Neither counsel objected; indeed Cummings's counsel, although questioning whether the court's original sentencing analysis remained effective, said "obviously, I'm not going to raise any defects in the *Hewey* analysis, if there are any."

[¶34]   We conclude, however, that the court's focus on the ultimate outcome of the second sentencing hearing resulted in an obvious error that we must correct.  *See* M.R.U. Crim. P. 52(b); *State v. Haji-Hassan*, 2018 ME 42, ¶ 18, 182 A.3d 145 ("We may take notice of an obvious error affecting a substantial right, even if the claim of error was not properly preserved." (quotation marks omitted)).  The problem lies in the differing maximum sentences imposed in the original and amended judgments—in the first judgment the court determined that a maximum sentence of fifteen years was appropriate based on the applicable aggravating and mitigating factors, and in the second it determined, without further analysis, that a maximum sentence of eight years was the appropriate result based on those same factors.  *See* 17-A M.R.S. § 1252-C(2). We do not intend to say that the sentence imposed in the amended judgment was incorrect, but it required a de novo sentencing analysis explaining how the court arrived at that new result.

[¶35] On remand, if the court again imposes a term of supervised release as a part of Cummings's sentence, it should clarify whether the conditions of supervised release include a requirement that Cummings submit to polygraph examinations at the request of his supervising official—a condition that he contends is both unsupported by the record and unconstitutional, if it was indeed imposed as a part of the court's amended sentence.

[¶36] Whether the court actually imposed that condition is unclear. The State is correct in noting that the amended judgment and commitment, which includes written conditions of Cummings's supervised release, says nothing about a polygraph testing requirement. That condition was requested by the State in its sentencing memorandum and discussed at the first sentencing hearing, where the State told the court that a polygraph requirement was "a standard part of the specialized sex offender protocol," and defense counsel countered that such a requirement was "dubious at best." The court, in orally reviewing the conditions of supervised release that it was imposing, indicated that "the internet, polygraph, residence [conditions], those all stay in," but the polygraph requirement was not listed among the specific written conditions imposed by the court in its judgment.

[¶37]  Because the trial court will be required to resentence Cummings as a result of our opinion, and because it is not clear that the court ultimately imposed a requirement that he submit to polygraph testing, we need not decide whether such a condition would be supported by the record in this case or whether it would violate Cummings's constitutional rights against self-incrimination, as he contends.  On remand, if the State again seeks a polygraph testing condition, the trial court will hear the parties' arguments and make a determination in the first instance as to whether it may, or will, impose any requested conditions.  *See Murray-Burns*, 2023 ME 21, ¶ 21, 290 A.3d 542 (declining an appellant's "invitation to provide prophylactic guidance . . . because the question is not ripe for our adjudication").

The entry is:

> Judgment of conviction affirmed. Sentence vacated. Remanded to the trial court for resentencing in accordance with this opinion.

---

Jamesa J. Drake, Esq. (orally), and Rory A. McNamara, Esq., Drake Law LLC, Auburn and York, for appellant Ronald T. Cummings

Toff Toffolon, Dep. Dist. Atty. (orally), Prosecutorial District VII, Ellsworth, for appellee State of Maine

Hancock County Unified Criminal Docket docket number CR-2018-1547